IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>BRADLEY GRANT KITCHEN, et al.,<br><br>Defendants. | MEMORANDUM DECISION AND ORDER ON ADMISSIBILITY OF CO-CONSPIRATOR STATEMENTS<br><br><br><br>Case No. 2:07-CR-895 TS |

This matter comes before the Court subsequent to a *James*[1] hearing held on July 8, 2008, to address the admissibility, under Fed.R.Evid. 801(d)(2)(E), of alleged co-conspirator statements. As discussed below, the Court finds that a conspiracy existed and that each of the Defendants were members of the conspiracy.

I.  BACKGROUND

Defendants are charged in a Superseding Indictment[2] with violations of 18 U.S.C. § 1341 (Mail Fraud), 18 U.S.C. § 1343 (Wire Fraud), and 18 U.S.C. § 1349 (Conspiracy).

The Court held a *James* hearing on July 8, 2008.  At the hearing, the government called

---

[1]*United States v. James*, 590 F.2d 575 (5th Cir.), *cert. denied*, 442 U.S. 917 (1979).

[2]Docket No. 151.

1

Investigator LeDoux to testify regarding the government's investigation. In addition, the government submitted a number of exhibits. Defendants were to submit their briefs on the issues raised at the hearing by July 22, 2008, but have failed to do so. The Court will proceed to determine these issues without the benefit of Defendants' arguments.

## II.  FINDINGS OF FACT

For purposes of determining the admissibility of co-conspirator statements under Rule 801(d)(2)(E) only, the Court finds the following:

A.      IDENTIFICATION OF THE PARTIES

Defendant Bolick was the owner of two entities known as Home Owners Group ("HOG") and Paragon Investment Group L.L.P. ("PIG"). Defendant Kitchen represented himself as a managing member or partner of HOG and PIG. Defendant Clarke was a licensed real estate agent. Defendant Cloward was a licensed Utah real estate appraiser working with Express Appraisal. Defendants Garrett and Hadlock were escrow officers working for Precision Title Company. Defendants participated in real estate transactions with HOG and PIG.

B.      THE SCHEME

The basic scheme Defendants allegedly engaged in proceeded as follows: Defendants engaged in "flip" transactions. A flip transaction is a transaction where a property is purchased at one price and then quickly resold at a higher, inflated price. The first part of the flip transaction involved HOG acquiring properties in the Provo River Bottoms area. In the second part of the flip transaction, HOG would quickly sell those properties to straw buyers. HOG sold the properties in the second half of the flip at a substantially higher rate than the properties had been purchased in the first half of the flip.

As indicated, in the second half of the flip transaction, HOG sold the properties to straw buyers. A straw buyer is one who gets paid for their participation in the transaction. The straw buyers in the transactions at issue here were given various information to induce them to participate in the transactions. The straw buyers were told that they would receive money, ranging from $50,000 to $90,000, for participating in the transactions. Additionally, the straw buyers were told that they would incur no out-of-pocket expense associated with the transaction.

As part of the scheme, the straw buyers made false statements in their loan applications. For example, the loan applications would inflate the straw buyer's assets and income. Additionally, the loan application would falsely indicate that the straw buyer intended to occupy the home.

In addition to false statements in loan applications, false representations were made to the lenders that down payments had been received for the second part of the flip when, in fact, they had not. Additionally, the closing of the purchases were structured in such a way that the first half of the flip transaction would close after the second half of the flip. By doing this, the loan from the second half of the flip was used to close both the first and second portions of the transaction. As a result, the lender was providing financing for both transactions. This information was not disclosed to the lenders.

C.      DEFENDANTS' ROLES IN THE SCHEME

Defendants Kitchen, Bolick, and Cloward acted as recruiters in the scheme. As recruiters, Defendants Kitchen, Bolick, and Cloward sought out individuals to act as straw buyers in the second part of the flip transaction. Additionally, the recruiters would coach the straw buyers on what was necessary to make the false statements made in the loan application appear true.

In addition to acting as a recruiter, Defendant Cloward acted as an appraiser with regard to the transactions at issue.[3] As the appraiser, Defendant Cloward prepared appraisals. Those appraisals reflected a higher value than the value at which HOG had purchased the property. Part of the appraisal report includes comparable sales. These are sales listed on the Multiple Listing Service ("MLS") which are similar in nature. As discussed below, Defendant Clakre made false entries into the MLS that Defendant Cloward used in the appraisal reports in order to justify the inflated appraisal amount. The inflated appraisal reports were then provided to the lenders. Lenders require an appraisal report to give a value statement and use the appraisal in their underwriting process. In addition, Defendant Cloward also acted as a buyer in another transaction.

Defendant Clarke acted as a real estate agent in relation to these transactions. In that role, Defendant Clarke input false information into the MLS. That false information was then absorbed into the appraisal reports in order to justify the higher value contained in the appraisal.

Defendants Garrett and Hadlock acted as escrow officers, or closing officers, in relation to some of the properties at issue. In these transactions, the escrow officer made false representations to the lender that down payments had been made. The closing officer also concealed that the transactions were closing backward. Additionally, the closing officer concealed the fact that the lender would be funding both transactions. Finally, the closing officer concealed that HOG did not have title to the property in question. In addition to acting as a closing officer, Defendant Garrett also acted as a straw buyer.

---

[3] Investigator LeDoux clarified at the *James* hearing that Defendant Cloward's company performed the appraisals and that Defendant Cloward performed some, but not all, of the appraisals.

Each of these roles, that of recruiter, real estate agent, appraiser, and closing officer, were critical in completing these transactions.

### III.  DISCUSSION

A.   STANDARD

Under Fed. R. Evid. 801(d)(2)(E), statements by co-conspirators are properly admissible as non-hearsay at trial if the Court determines, by a preponderance of the evidence, that (1) a conspiracy existed; (2) the declarant and the defendant were both members of the conspiracy; and (3) the statements were made in the course of and in furtherance of the conspiracy.[4]  It is the burden of the government to prove each of the elements by a preponderance of the evidence and it is the trial court that determines admissibility.[5]  In deciding whether the prerequisites for admission of the co-conspirator statements have been satisfied, the Court may consider the co-conspirator statements sought to be admitted as evidence of the conspiracy.[6]  The Tenth Circuit has held, however, that "there need . . . be some independent evidence linking the defendant to the conspiracy."[7]  "Such independent evidence may be sufficient even when it is not 'substantial.'"[8]  The Tenth Circuit has defined "independent evidence" as "evidence other than the proffered [co-conspirator] statements themselves."[9]

---

[4] *United States v. Urena*, 27 F.3d 1487, 1490 (10th Cir. 1994).

[5] *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987); *United States v. Owens*, 70 F.3d 1118, 1123 (10th Cir. 1995).

[6] *United States v. Lopez-Gutierrez*, 83 F.3d 1235, 1242 (10th Cir. 1996).

[7] *United States v. Martinez*, 825 F.2d 1451, 1453 (10th Cir. 1987).

[8] *Lopez-Gutierrez*, 83 F.3d at 1242.

[9] *Martinez*, 825 F.2d at 1451.

B.     ANALYSIS

   1.     *Existence of a Conspiracy*

The first element the Court must consider is the existence of a conspiracy.  "To prove conspiracy, the government must show (1) two or more persons agreed to violate the law, (2) the defendant knew the essential objectives of the conspiracy, (3) the defendant knowingly and voluntarily participated in the conspiracy, and (4) the alleged coconspirators were interdependent."[10]

"'To prove an agreement, the government need not offer direct proof of an express agreement on the part of the defendant.  Instead the agreement may be informal and may be inferred entirely from circumstantial evidence.'"[11]  However, it is not enough for the government to show only mere association with conspirators known to be involved in the crime; casual transactions between the defendant and conspirators known to be involved in the crime; or a buyer-seller relationship between the defendant and a member of the conspiracy.[12]

The government has presented sufficient evidence to show that there was an agreement between Defendants to violate the law by engaging in the scheme set forth above.  The evidence presented by the government shows that Defendants engaged in a scheme whereby Defendants Kitchen, Bolick, and Cloward recruited straw buyers to buy properties at inflated prices.  The straw buyers made false statements in their loan applications and false information was provided to the lenders.  Defendant Cloward created inflated appraisal reports that relied upon false MLS

---

[10]*United States v. Yehling*, 456 F.3d 1236, 1240 (10th Cir. 2006).

[11]*United States v. Pulido-Jacobo*, 377 F.3d 1124, 1129 (10th Cir. 2004) (quoting *United States v. Lang*, 364 F.3d 1210, 1223 (10th Cir. 2004)).

[12]*United States v. Evans*, 970 F.2d 663, 669 (10th Cir. 1992).

information to justify the inflated prices. Defendant Clarke input the false information into the MLS which was incorporated into the inflated appraisal reports to supported the inflated values. Finally, Defendants Garrett and Hadlock, in their role as escrow officers, concealed various facts from the lenders.

"To prove knowledge of the essential objectives of a conspiracy, the government does not have to show the defendant knew all the details or all the members of a conspiracy."[13] "Rather, the government only needs to demonstrate the 'defendant shared a common purpose or design with his alleged coconspirators.'"[14]

The government has presented sufficient evidence to show that Defendant knew of the essential objectives of the conspiracy. This is evident not only from the communications between the Defendants,[15] but also statements made by the straw buyers[16] and others[17] as well as the documentation surrounding the transactions.[18]

"A defendant may be convicted of a conspiracy only if the government proves that the defendant had knowledge of the conspiracy and voluntarily participated therein. A conspirator need not know of the existence or identify of the other members of the conspiracy or the full extent of the conspiracy, but he or she must have a general awareness of both the scope and the

---

[13] *Yehling*, 456 F.3d at 1240.

[14] *Id.* (quoting *Evans*, 970 F.2d at 669).

[15] *See* James Exs. 15–21.

[16] James Ex. 6.

[17] James Ex. 5.

[18] James Exs. 9–14.

objective of the enterprise to be regarded as a coconspirator."[19]

For the reasons discussed above, the government has presented sufficient evidence to show that Defendants knowingly and voluntarily took part in the conspiracy.

"Interdependence exists when 'each alleged coconspirator . . . depend[s] on the successful operation of each 'link' in the chain to achieve the common goal.'"[20]  "In other words, each coconspirator's 'actions must facilitate the endeavors of other alleged coconspirators or facilitate the venture as a whole.'"[21]

Here, the government has shown sufficient evidence of interdependence.  As set forth above, each Defendant played an individual role in accomplishing the scheme.  Defendants Kitchen, Bolick, and Cloward acted as recruiters.  Defendant Cloward acted as an appraiser.  Defendant Clarke acted as the real estate agent.  Defendants Garrett and Hadlock acted as escrow officers.  Each of these roles—that of recruiter, real estate agent, appraiser, and closing officer—were critical in completing these transactions.  Each role facilitated the endeavors of the others and facilitated the venture as a whole.

Based on the above, the government has shown, by a preponderance of the evidence, the existence of a conspiracy between Bradley Kitchen, David Bolick, Steve Cloward, Ron Clarke, Jeffery Garrett, and Rebecca Hadlock.  The Court bases this conclusion on both the statements of the co-conspirators and the other supporting independent evidence presented by the government.

---

[19]*Evans*, 970 F.2d at 669–70 (internal quotation marks and citation omitted).

[20]*Yehling*, 456 F.3d at 1241 (quoting *United States v. Dickey*, 736 F.2d 571, 582 (10th Cir. 1984)).

[21]*Id*. (quoting *Evans*, 970 F.2d at 670).

   *2.     Members of the Conspiracy*

The second element the Court must consider is whether the declarant and the defendant were both members of the conspiracy.  Based on the discussion set forth above, the Court finds that the government has proven by a preponderance of the evidence that each Defendant was a member of the conspiracy.

   *3.     During the Course and in Furtherance of the Conspiracy*

Finally, the Court must consider whether the statements were made during the course and in furtherance of the conspiracy.  A statement is made during the course of a conspiracy if it is made before the objectives of the conspiracy have either failed or been achieved.[22]  "Statements by a conspirator are in furtherance of the conspiracy when they are 'intended to promote the conspiratorial objectives.'"[23]  Such promotion occurs through statements that explain events of importance to the conspiracy in order to facilitate its operation, statements between co-conspirators which provide reassurance, which serve to maintain trust and cohesiveness among them, or which inform each other of the current status of the conspiracy, and statements of a co-conspirator identifying a fellow co-conspirator.[24]  A statement need not further the attainment of an agreement; it is enough that it further an object of the agreement.[25]

---

[22]*United States v. Perez*, 989 F.2d 1574, 1579 (10th Cir. 1993).

[23]*United States v. Townley*, 472 F.3d 1267, 1273 (10th Cir. 2007) (quoting *United States v. Reyes*, 798 F.2d 380, 384 (10th Cir. 1986)).

[24]*Id.*

[25]*United States v. Magleby*, 420 F.3d 1136, 1145 (10th Cir. 2005).

The Court is unable, at this time, to determine whether all of the statements the government seeks to introduce[26] were made during the course and in furtherance of the conspiracy. Therefore, the Court will reserve this issue for trial and will rule upon the individual statements as they arise in that setting.

## IV.  CONCLUSION

It is therefore

ORDERED that Defendants' Motions for James Hearing (Docket Nos. 39, 48, 50, 52, and 85) are GRANTED. As set forth above, the Court finds that a conspiracy existed and that each of the Defendants were members of the conspiracy. It is further

ORDERED that the time from the filing of the Motions through August 13, 2008, is excluded from the computation of the Speedy Trial Act time pursuant to 18 U.S.C. § 3161(h)(1)(F) and (J).

DATED   July 31, 2008.

BY THE COURT:

_____
TED STEWART
United States District Judge

---

[26] *See* James Ex. 1.